**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| K.D., a minor, by and through her | : | |
| parents, THERESA DUNN and | : | |
| JONATHAN DUNN, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | NO. 16-0165 |
| DOWNINGTOWN AREA SCHOOL | : | |
| DISTRICT, | : | |
| | : | |
| Defendant. | : | |

## M E M O R A N D U M

STENGEL, C.J.                                                    August 31, 2017

## I.    INTRODUCTION

This is a case brought under the Individuals with Disabilities Education Act, 20

U.S.C. § 1400 *et seq.* (IDEA) by parents of a young girl with a learning disability.[1] The

parents took their daughter, K.D., out of a public school district and placed her in private

school. They then sought reimbursement from the school district for K.D.'s private

school tuition, arguing the school district denied K.D. a free and appropriate public

education. A Hearing Officer denied the parents' requested relief. Thereafter, the parents

commenced this action.

---

[1] The parents also bring claims under Section 504 of the Rehabilitation Act, 29
U.S.C. § 794 (RA) and the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq.*
(ADA).

## II.    BACKGROUND

In 2011, K.D., a young girl, began kindergarten at Pickering Valley Elementary School in Chester Springs, Pennsylvania. Pickering Valley Elementary School is within the Downingtown Area School District. (Doc. No. 1-4, Findings of Fact at 4 ¶ 4) [hereinafter "FF"].[2] About halfway through K.D.'s kindergarten year, the School District began providing K.D. with an Instructional Support Team ("IS Team"). (FF at 4 ¶ 5). The IS Team was provided to more closely monitor K.D.'s educational progress. (Id. at 4 ¶ 5). It also gave K.D. support and instruction. (Id.).

In April of K.D.'s kindergarten year, K.D.'s parents met with K.D.'s IS Team. (Id. at 4 ¶ 6). Both the parents and IS Team agreed that a special education evaluation was needed for K.D. (Id.). A school psychologist recommended they wait to evaluate K.D. until after she finished kindergarten because some of the relevant tests are not designed to be administered to students until after kindergarten. (Id. at 4 ¶ 8). The parents agreed to wait. (Id.).

Thereafter, the School District evaluated K.D. (Id. at 4 ¶ 1). The School District met with K.D.'s parents and gave them an evaluation report. (Id.). This report included remarks from a classroom observation,[3] input from K.D.'s kindergarten teachers, parental

---

[2] Prior to this action being filed, there was a Special Education Hearing conducted by the Downingtown Area School District regarding K.D. Both parties rely on the Special Education Hearing Officer's findings of fact to support their motions. As acknowledged by the Hearing Officer and the parties, the facts are largely agreed upon. The disagreement largely lies in the application of law to these facts.

[3] This classroom evaluation occurred on April 30, 2012. (FF at 4 ¶ 2).

input, and a summary of K.D.'s academic performance. (Id. at 4 ¶ 2). K.D.'s academic performance was recorded as "low." (Id.).

A School District psychologist also evaluated K.D.'s cognitive ability. (Id. at 4 ¶ 3). She did this using the Wechsler Intelligence Scale for Children ("WISC-IV"). (Id.). K.D.'s overall IQ score was in the "low average" range. (Id.). K.D. scored "average" in verbal comprehension and working memory. (Id.). K.D.'s perceptual reasoning and processing speed were assessed at the "borderline" range. (Id.). The psychologist determined that K.D. met the diagnostic criteria for Attention Deficit Hyperactivity Disorder ("ADHD"). (Id. at 4 ¶ 4).

In addition to the WISC-IV, the School District had K.D.'s parents and teachers complete a Behavior Rating Inventory of Executive Functioning ("BRIEF"). (Id. at 4 ¶ 5). The BRIEF was developed in 2000 to assess the executive functioning of children ages 5 to 18. It is an 86-item questionnaire, usually filled out by parents and teachers alike. K.D.'s parents' and teachers' responses to the BRIEF indicated K.D. had clinically significant T-Scores on several scales.[4] (Id.).

The School District also had K.D.'s teachers complete a Behavioral Assessment System for Children ("BASC-2") test. (Id.). Similar to the BRIEF, the BASC-2 measures a child emotionally and behaviorally. The results of K.D.'s BASC-2 suggested K.D. had difficulty with impulsivity and organization. (Id.).

---

[4] A BRIEF produces several different types of scores or summaries. One of these types—a "T-Score"—measures a child's individual scores relative to other children's scores in the relevant demographic. In other words, it looks at how the child is doing compared to other children.

In addition to the BASC-2 and WISC-V, the School District psychologist also used select subtests from the Wechsler Individual Achievement Test ("WIAT-III"). (Id. at 5 ¶ 6). K.D. scored "average" on the oral language composite, "below average" in total reading and basic reading, and "extremely low" in early reading skills. (Id.). With specific regard to the Oral Reading Fluency subtest, a score could not be obtained because K.D. was not able to read the passages presented. (Id. at 5 ¶ 7). K.D. scored "below average" in math and written expression. (Id. at 5 ¶¶ 8–9).

Based on all the above, the School District concluded that K.D. qualified for special education services. (Id. at 5 ¶ 10). The School District found K.D. to have a primary disability category of Specific Learning Disability ("SLD") and a secondary category of Other Health Impairment ("OHI"). The following facts, which delve into the School District's conduct and K.D.'s progress, form the basis for the instant action.

### A. The First Individualized Education Program ("IEP")

On September 14, 2012, the School District offered K.D. an Individualized Education Program ("IEP"), which K.D.'s parents signed and approved. (FF at 5 ¶ 12).[5] The IEP was also signed by Ms. Suzanne Bargmann (K.D.'s regular education teacher) and Ms. Lindsay Smith (K.D.'s special education teacher). (Doc. No. 13-3, Sept. 2012 IEP) [hereinafter "First IEP"]. This IEP was designed for K.D.'s first-grade school year.

The IEP contained measureable annual goals tailored toward helping K.D. in the following areas: (1) letter naming and letter sound frequency, (2) letter writing, (3)

---

[5] An IEP, required by federal law, is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" various guidelines. 20 U.S.C. § 1414(d)(1)(A)(i).

rhyming, (4) reading comprehension, (5) writing, (6) starting and completing tasks, (7) math facts, and (8) math calculation. (First IEP at 13–17). The IEP also contained specifically designed instructions ("SDIs"). For example, the IEP provided K.D. with extended time for quizzes and tests, audio books, a "think aloud, visual imagery" approach for text recall, and testing in a quiet location. (Id. at 18–19). The IEP provided K.D. with three hours per school day of learning support instruction. (FF at 5 ¶ 16).

### B.     K.D.'s First-Grade School Year

With the first IEP in place, K.D. began first grade at Pickering Valley Elementary School. She spent part of her time in class with Ms. Smith (special education) and part of her time in class with Ms. Bargmann (regular education).

The IEP was informally modified in January 2013 by Ms. Smith. (FF at 6 ¶ 17). Ms. Smith changed K.D.'s homework and gave her a packet of stories in an attempt to help improve K.D.'s reading and letter-naming skills. (Id.). During K.D.'s first-grade year, the School District determined that K.D. qualified for extended school year services. (Id. at 6 ¶ 18). The School District offered this service hoping it would prevent K.D. from regressing over the summer into second grade. (Id.).

In the Spring of K.D.'s first-grade year, Ms. Smith became concerned with K.D.'s visual and motion skills. (Id. at 6 ¶ 19). Therefore, the School District requested an Occupational Therapy screening of K.D. with a private agency. (Id.). A week later, K.D.'s IEP team reconvened to add extended school year services to her IEP. Specifically, the School District offered three hours of academic support, three days a week, from July 1, 2013 to August 1, 2013. (Id. at 6 ¶ 20).

In June of K.D.'s first-grade year, the IEP team reconvened to develop a new IEP for K.D.'s second-grade year.

### C.     *The Second IEP*

To formulate a second IEP, in June 2013, the IEP team gathered updated data and information from K.D.'s teachers. (FF at 6 ¶ 22).

Like with the first IEP, this second IEP also had measurable annual goals. (Id.). The goal for K.D.'s letter naming and sound frequency remained the same, but her baseline rose from 11 to 24. (Id.). K.D.'s letter writing, rhyming, starting and completing tasks, and math goals remained the same. (Id.). K.D.'s reading comprehension goal changed in that the reading probes were given at the first/second grade level and K.D. was not expected to answer both literal and inferential questions. (Id.). K.D.'s writing goal changed in that the new IEP expected K.D. to write more—going from 1 sentence to 1-3 sentences. (Id.). K.D.'s math calculation goal improved, moving from number correspondence to addition and subtraction. (Id.). This new IEP added a new SDI: an "evidence based multi sensory reading and writing program" for 2.5 hours in K.D.'s Language Arts class. (Id. at 7 ¶ 23). The IEP kept in place supplemental level of learning support and extended school year services.

In the Summer of 2013, K.D.'s parents asked Ms. Smith about testing K.D. for dyslexia and dysgraphia. (Doc. No. 13-1 at 5 ¶ 16).[6] Ms. Smith responded that school psychologists do not diagnose dyslexia or dysgraphia. (FF at 7 ¶¶ 27–28). Ms. Smith

---

[6] Dyslexia is a learning disorder characterized by difficulty in learning to read or interpret words. Dysgraphia is the inability to write coherently.

nonetheless offered to put K.D.'s parents in touch with the school psychologist. (Id. at 7 ¶ 28). K.D.'s parents also asked Ms. Smith if the School District offered the Wilson reading program. (Id.). The Wilson Reading System ("WRS") is an instructional program used to help struggling readers. Ms. Smith responded that the School District did not offer Wilson until intermediate grades, but it did have a program with a similar approach geared toward younger children. (Id.).

### D.    K.D.'s Second-Grade School Year

In September 2013, K.D. began second grade. (FF at 7 ¶¶ 28–29).

Prior to this school year, the School District used a reading program called Harcourt/Project Read. (Id. at 7 ¶ 30). However, beginning in 2013, the School District changed over to Fundations, which is a Wilson reading program. (Id. at 7 ¶¶ 30–31). Coincidentally, Wilson was the type of reading program requested by K.D.'s parents a few months prior. (Id. at 7 ¶ 28).

K.D. took the Fundations placement test beginning her second-grade year. (Id. at 7 ¶ 32). K.D. placed at Level 1. (Id.). Both parties agree that mastery of one level is required before moving on to the next level of Fundations. (Id. at 7 ¶ 33). K.D. did not meet the required criteria in 7 of the 11 units taught in second grade. (Id.). In addition to Fundations, K.D. participated in the School District's regular reading program, "Being a Writer." (Id. at 8 ¶ 35).

K.D. took one Fundations placement test in October and another in August. (Id. at 8 ¶ 34). In the category of naming letters, K.D. improved from a 75% to a 95%. (Id.). In the category of sound-to-letter correspondence, K.D. improved from 80% to a Level 1 at

100%. (Id.). In the category of writing letters and words, K.D. improved from a 70% to a Level 1 at 80%. (Id.). In the category of reading words, K.D. improved from "no level" to a Level 1 at 48%. (Id.).

A month later, K.D.'s IEP was again amended to reflect her participation in the Fundations program. (Id. at 8 ¶ 36). It was also amended to add some Occupational Therapy services to K.D. (Id.). This included Occupational Therapy goals and evaluation. (Id.). At the end of her second-grade year, the School District again offered K.D. extended school year services for the summer. (Id. at 8 ¶ 37).

At the end of her second-grade year, the IEP team met to formulate an IEP for K.D.'s third-grade year. (Id. at 8 ¶ 38).

### E.    *The Third IEP*

In May of 2014, the IEP team met to develop a new IEP for the 2014-2015 school year. (Id. at 8 ¶ 38).

The new IEP reflected K.D. making progress in literal and inferential comprehension. (Id. at 8 ¶ 39). K.D. had mastered the rhyming goal from the previous IEP at this point. (Id.). K.D. was earning an average of 87% on Fundations phonics tests and being re-tested when she did not pass. (Id.). K.D. had mastered her letter sounds goal but not the letter naming fluency goal. (Id.). Finally, this IEP reflected K.D.'s progress in writing, math, and on-task behavior with the use of prompts and supports. (Id.).

The IEP team increased K.D.'s baseline from a 24 to a 34 in letter naming fluency. (Id. at 8 ¶ 40). The team also added to the IEP a nonsense word reading fluency goal. (Id.). K.D.'s letter writing goal was removed. (Id.). As for literal and inferential

comprehension, the IEP moved K.D. up from a first/second grade level to a second grade level. (Id. at 8 ¶ 41).

The IEP increased K.D.'s writing goal. (Id. at 9 ¶ 42). Her original IEP had a goal of 1 sentence and then was increased to 1-3 sentences in the second IEP. At this point, K.D. could write 3 sentences with some prompting. (Id.). Her goal in the third IEP was increased to 3-5 sentences. (Id.). As for math, the newest IEP added a baseline to reflect K.D.'s mastery of the prior level and the goal was increased. (Id. at 9 ¶ 44).

Following her second-grade year, K.D.'s parents hired a tutor for K.D. (Id. at 9 ¶ 52). K.D. also attended the School District's extended school year services that summer. (Id.). The newest IEP kept in place K.D.'s prior Occupational Therapy goals and SDIs. (Id. at 9 ¶¶ 45–46). This same summer, K.D.'s parents obtained an independent educational evaluation at their expense. (Id. at 9 ¶ 53).

## F. K.D.'s Independent Neuropsychological Evaluation Results

K.D.'s parents retained Dr. Karen Kelly, a neuropsychologist, to independently evaluate K.D on July 21, 2014. (Doc. No. 13-1 at 10 ¶ 31).

Dr. Kelly prepared a report of her findings. (Doc. No. 13-6, Dr. Kelly Report). The results were varied. On one hand, Dr. Kelly found K.D. to have overall intellectual functioning in the "average" range. (Dr. Kelly Report at 9). However, in other specific subareas, K.D.'s abilities were significantly lower. (Id.). In particular, Dr. Kelly noted K.D. had "[s]evere reading deficits." (Id. at 10). At the age of 8, going into 3rd grade, Dr. Kelly surmised K.D.'s reading ability was "less than first grade" level. (Id. at 11).

In Dr. Kelly's summary, she noted that K.D. was reading about 4 words per minute. (Id. at 15). A student K.D.'s age should be reading about 89 words per minute. (Id.). Dr. Kelly found this to be "clearly representative of [K.D.'s] inability to benefit from the program delivered by the school and further representative of global disregard for this level of impairment, without recommendations of more intensive or alternative instruction, given her flattened response to the instruction." (Id.). Dr. Kelly viewed K.D.'s reading difficulty as a direct result of the School District's inability to adapt K.D.'s IEP to her needs year-to-year. (Id.).

Dr. Kelly diagnosed K.D. with developmental dyslexia, mathematics disorder, ADHD, and a cognitive disorder. (Id. at 16). She recommended an intervention plan by K.D's IEP team that included: (1) "a different approach to learning how to read, which should include multisensory, direct, sequential, and intensive remedial work"; (2) more explicit and intensive literacy instruction; and (3) code-based instruction. (Id. at 16–18). Dr. Kelly also recommended changes to K.D.'s math curriculum, monitoring of K.D., Occupational Therapy, and speech therapy. (Id. at 19–23).

### G. Kelly's Third-Grade School Year

K.D. began her third-grade year in 2014. (FF at 10 ¶ 58).

In the beginning of this school year, K.D.'s parents met extensively with K.D.'s teachers and administrators to revise the IEP. (Id. at 10–11). K.D.'s parents began working with an educational advocate. (Id. at 10 ¶ 59). After several discussions, the School District offered a one-on-one aide for K.D. (Id. at ¶ 66). K.D.'s parents rejected this offer because they feared it would make K.D. "stand out." (Id.).

The School District readministered the tests they had given K.D. when she started school in kindergarten. Per the new WISC-IV, K.D.'s IQ score improved into the "average" range. (Id. at 11 ¶ 68). K.D.'s perceptual reasoning and processing speed also improved. (Id.). Her verbal comprehension and working memory remained in the "average" range. (Id.). With the WIAT-III test, K.D. improved in some areas and did worse in others. (Id. at 11–12).

In December of 2014, the IEP team reconvened to make changes to the IEP again. This time, the School District substituted nonsense word fluency for letter naming. (Id. at 12 ¶ 76). K.D.'s writing goal remained at 3-5 sentences, but specific goals were added: topic sentence, supporting details, and a concluding sentence. (Id. at 12 ¶ 78). K.D.'s math goals were increased. (Id. at 12 ¶ 79).

Most significant, several modifications were made to K.D.'s SDIs. The IEP offered "[d]irect, evidence based, multisensory reading instruction for 45 minutes per day with an additional 10 minutes of 1:1 assistance for reinforcement." (Id. at 13 ¶ 83). It also offered "[d]irect, evidence based math instruction for 60 minutes per day." (Id.). Lastly, it offered "[d]irect instruction using an evidence based writing program for 45 minutes per day." (Id.).

### H.    *K.D.'s Withdrawal from Public School*

Per Dr. Kelly's recommendation, in December of 2014, the School District offered to abandon the Wilson reading program (Fundations) it had used with K.D. (Id. at 13 ¶ 85). In its place, the School District offered to add both (1) SRA/Corrective Reading, and (2) FastForward. (Id.). SRA/Corrective Reading and FastForward are research-based

programs that provide instruction in the areas of phonics and reading comprehension. (Id.).

K.D.'s parents wrote a letter stating some concerns with the newest proposed IEP. (Id. at 13 ¶ 86). They opined that K.D.'s progress had been "miniscule" and requested "language-based instruction across [K.D.'s] entire day." (Id.). The School District offered the above IEP with its modification, additions, and the proposal to change its reading program again.

On December 24, 2014, K.D's parents formally rejected the latest IEP. (Id. at 13 ¶ 87). They wrote a letter giving the School District notice that in 10 days they intended to withdraw K.D. from the School District. (Id.). The parents also communicated their intent to place K.D. in private school. (Id.). Finally, they wrote that they would seek tuition reimbursement from the School District for the cost of K.D.'s private education. (Id.). In June of 2015, K.D. enrolled in private school. (Id. at 14 ¶ 90).

## I.       *Due Process Hearing for Tuition Reimbursement*

Soon after K.D.'s parents placed her in private school, they sought tuition reimbursement from the School District.

In the Fall of 2015, hearings were conducted regarding this issue. On January 4, 2016, a Hearing Officer issued a decision, finding that the parents were not entitled to tuition reimbursement. The Hearing Officer noted that K.D. had difficulties progressing while at the School District. He nonetheless found that the School District frequently tried to help K.D. make progress through various approaches memorialized in K.D.'s IEPs. The Hearing Officer found K.D.'s IEPs to be reasonably calculated to provide K.D.

with a meaningful educational benefit. K.D., through her parents, then commenced this action by filing a complaint on January 14, 2016.

## III.  DISCUSSION

K.D.'s parents bring this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* (IDEA), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (RA), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 (ADA). In essence, K.D.'s parents appeal the Hearing Officer's determination that they are not entitled to tuition reimbursement for K.D.'s private school education.

### A.    *Standard of Review – IDEA*

In considering a challenge to an administrative decision on an IDEA claim, district courts employ a "modified de novo" standard of review. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003). District courts may reach different decisions than a hearing officer, but must accord the decision of the hearing officer "due weight." Carlisle Area Sch. Dist. v. Scott P. ex rel. Bess P., 62 F.3d 520, 524 (3d Cir. 1995), cert. denied, 517 U.S. 1135 (1996). This "due weight" standard means that a hearing officer's factual findings shall be considered *prima facie* correct. S.H., 336 F.3d at 269–70.

When a district court departs from the hearing officer's decision, it must provide some explanation for that departure. Id. at 270. District courts must accept the hearing officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would *justify* a contrary conclusion." Shore Reg'l High Sch. Bd. of Educ. v. P.S.

ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (emphasis in original). "[C]laims for compensatory education and tuition reimbursement are subject to plenary review as conclusions of law. . . . [W]hether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question[ ] of fact." P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009).

### B.     IDEA Claim

A core tenet of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education" ("FAPE"). 20 U.S.C. § 1400(d)(1)(A). A FAPE includes both a "special" education and "related services." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 994 (2017) (citing 20 U.S.C. § 1401(9)). Public schools must therefore provide a disabled child with special education and services "in conformity with the [child's] individualized education program," or IEP. Id. (citing 20 U.S.C. § 1401(9)(D)).

The individualized education program—or IEP—is "the centerpiece" of the IDEA. Id. An IEP involves the input of a child's teachers, parents, and school officials. Id.; 20 U.S.C. § 1414(d)(1)(B). This requires careful consideration of a child's individual circumstances. 20 U.S.C. § 1414. "'An IEP consists of a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services.'" D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (quoting Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589 (3d Cir. 2000)). In developing an IEP, a school district is "not required to provide a specific program or employ a specific methodology

requested by a parent." <u>Parker C. ex rel. Todd v. West Chester Area Sch. Dist.</u>, Civ. A. No. 16-4836, 2017 WL 2888573, at *7 (E.D. Pa. July 6, 2017) (<u>citing</u> <u>Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 199 (1982)).

To comply with the IDEA, a student's IEP must be "reasonably calculated to enable the child to receive educational benefits." <u>Endrew F.</u>, 137 S. Ct. at 995–96. When an IEP is reasonably calculated to enable a disabled child to receive educational benefits, the child has received a FAPE. Conversely, when an IEP is not reasonably calculated under this standard, the child has been denied a FAPE.

Until recently, the Supreme Court had "declined 'to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the Act.'" <u>Id.</u> at 997 (<u>quoting</u> <u>Rowley</u>, 458 U.S. at 202). The Supreme Court recently clarified this "reasonably calculated" standard in <u>Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1</u>, 137 S. Ct. 988 (2017). There, it held: "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Id.</u> at 999.

This last phrase—"appropriate in light of the child's circumstances"—demands a "fact-intensive exercise" informed by the expertise of school officials and the child's parents or guardians. <u>Id.</u> The question is ultimately whether the IEP is "reasonable," not whether it is "ideal." <u>Id.</u> To this end, the IEP must be "appropriately ambitious," and the progress contemplated must be "appropriate in light of the child's circumstances." <u>Id.</u>

Unlike in <u>Rowley</u>, which involved "a young girl who was progressing smoothly through the regular curriculum," <u>Endrew F.</u> presented the much more difficult question of what qualifies as a reasonably calculated IEP for a child with disabilities. The Court acknowledged that the IEP must aim for the progress that is appropriate given each child's unique makeup. Accordingly, if it is not reasonable to expect a certain child to progress smoothly through a school's regular curriculum, that child's "IEP need not aim for grade-level advancement." <u>Id.</u> at 1000; <u>see also</u> <u>Parker C.</u>, 2017 WL 2888573, at *7 ("An 'IEP need not aim for grade-level advancement' if such a goal 'is not a reasonable prospect for a child.'") (<u>quoting</u> <u>Endrew F.</u>, 137 S. Ct. at 1000)). Nonetheless, the IEP must be "appropriately ambitious in light of [the child's] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom." <u>Endrew F.</u>, 137 S. Ct. at 1000.[7]

---

[7] The parties have differing interpretations of the import of <u>Endrew F.</u> on this case. According to plaintiffs, <u>Endrew F.</u> suggests that the IEPs K.D. was offered were not reasonably calculated to result in progress. According to the School District, <u>Endrew F.</u> simply confirms the standard that has been used in the Third Circuit for years. The School District also argues that, unlike in <u>Endrew F.</u>, no improper legal standard was applied.

I agree with the School District. In <u>Endrew F.</u>, the Supreme Court granted certiorari to correct an improper legal standard applied below. There, the Court rejected an interpretation that <u>Rowley</u>'s "some educational benefit" means only "some" benefit or a benefit that is "merely . . . more than *de minimis*." <u>Endrew F.</u>, 137 S. Ct. at 997. The improper "some" benefit or "more than *de minimis*" standard was not applied by the Hearing Officer in this case. <u>See</u> Doc. No. 1-4 at 16, 25 (applying the "meaningful educational benefit" standard). Indeed, this standard was rejected by the Hearing Officer. <u>Id.</u> at 16 ("Meaningful educational benefit is more than a trivial or *de minimis* educational benefit."). The watered-down and incorrect standard used by the lower courts in <u>Endrew F.</u> has never been employed here.

### C.     K.D. Was Not Denied a FAPE

The plaintiffs, K.D.'s parents, argue that, in ruling in favor of the School District, the Hearing Officer committed legal error because: (1) the IEPs "repeated the same goals from year to year with no change in instruction"; (2) the Hearing Officer erred in finding K.D. made "appropriate progress" because she was reading below grade-level; (3) a 2014 reading score on one of K.D.'s tests decreased compared to her 2012 score; and (4) the Hearing Officer erred in assessing the plaintiffs' expert witness's credibility. Each of these arguments is considered in turn. Because they are so intertwined, I will discuss the first (the IEPs) and second (K.D.'s progress) arguments together.

### 1.     K.D.'s IEPs Year-to-Year and K.D.'s Progress

K.D.'s IEPs were reasonably calculated to enable her to make meaningful progress appropriate in light of her circumstances. Contrary to the plaintiffs' assertions, the IEPs were not the same year-to-year.

It is fundamental that, before an IEP is initially developed, the child's "present levels of achievement, disability, and potential for growth" must be considered. Endrew F., 137 S. Ct. at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV), (d)(3)(A)(i)–(iv)). In this case, the School District did just that before fashioning K.D.'s IEPs. Based on a myriad of tests employed and data gathered, it was revealed that K.D. had a significant learning disability that affected her ability to read and do math.

The first IEP targeted K.D.'s areas of difficulty. Under the first IEP, K.D. received instruction in both the regular classroom and the special education classroom. The first IEP also offered the use of an evidence-based multisensory reading program. (First IEP at

13). Using this reading program, the IEP set annual measurable goals regarding letter naming fluency, letter sound fluency, phoneme segmentation fluency, and nonsense word fluency. (Id.). It also gave K.D. a "baseline" in these areas, ranging from 0 to 11. (Id.). The first IEP also gave K.D. goals to strive for in the areas of writing, visual identification and rhyming objects, verbal comprehension, spelling, phonetics, task-orientation, and math. (Id. at 13–17).

The first IEP contained various specifically designed instructions ("SDIs"): (i) extended time for tests and quizzes; (ii) preview text and utilize prediction strategies; (iii) opportunities for choral reading and partner reading; (iv) provide books on tape; (v) provide a "think aloud, visual imagery" approach for text recall; (vi) preview vocabulary in text; (vii) provide manipulatives in math; (viii) provide testing in a quiet location; (ix) provide activities to improve sentence construction/composition; (x) positive praise and support for on-task behaviors; (xi) provide short and clear directions and clarify understanding; (xii) chunking assignments; and (xiii) preferential seating. (Id. at 18–19).

K.D.'s parents argue that the above IEP was repeated, year-to-year, with no real changes being made. This argument misses the mark for two reasons. First, factually, it is not accurate. Second, and more important, the "results-oriented" line of reasoning plaintiffs present is an improper method of determining whether a FAPE has been denied in this case.

### a.  The IEPs Contained Meaningful Changes

The second IEP contained significant changes and modifications aimed at providing K.D. with a meaningful educational benefit. Most notable, the second IEP

added a new specifically designed instruction ("SDI") that was not in the first IEP: an "evidence based multi sensory reading and writing program" for 2.5 hours in K.D.'s Language Arts class. (Doc. No. 13-4, Second IEP at 18). In other words, K.D. received direct instruction, every day, for multiple hours per day, in reading. The second IEP also included a new SDI for math that was not in the first IEP: "Direct instruction in the area of mathematics using an evidence based math program to include the KTAV styles of learning." (Second IEP at 18).

It is true that many of the annual goals in K.D.'s first IEP remained unchanged in her second IEP. However, contrary to plaintiffs' argument, this is not *per se* evidence that the School District denied K.D. a FAPE. K.D.'s baseline levels in many areas increased, reflecting improvement. As demonstrated by the Hearing Officer, the fact that the School District did not raise the goals merely shows it was continuing to target K.D.'s reading ability with repetition in core areas. Even plaintiffs' expert recognized that for a child "as deficitted as [K.D.] . . . just learning the code at the very low levels needs to take place before any kind of generalization could occur." (N.T. at 335:18–25). The School District psychologist, Dr. Jodi Cuniffe, similarly testified that letter naming fluency and sounds are such fundamental skills that they must be mastered before a child moves on to learn sound-symbol relationships. (N.T. at 255:3–10).

For these reasons, this case is a perfect example of the tension between "potential" and "progress." Although minimal progress may sometimes be evidence of denial of a FAPE, M.C. ex rel. J.C. v. Central Reg'l Sch. Dist., 81 F.3d 389, 392–93 (3d Cir. 1996), a particular child's progress must always be assessed alongside that child's "potential,"

19

Endrew F., 137 S. Ct. at 999. In K.D.'s case, her progress must necessarily be considered in light of the fact that she suffers from a severe learning disability and ADHD.

Of course, this does not mean that the School District can repeat its same approach to instruction if its approach proved unsuccessful. But that is not what the School District did here. Instead, it tried three separate reading programs with K.D. First, it used the Harcourt/Project Read system, then it switched over to Wilson's Fundations program, and then it offered the SRA/Corrective Reading and FastForward research-based programs. The School District also offered K.D.'s parents a one-on-one aide, but they rejected this offer out of a fear that this would make K.D. stand out.[8]

### b. *In Light of Her Circumstances, K.D. Made Appropriate and Meaningful Progress*

The evidence of record shows that K.D. did progress. Of course, a child's educational progress is on a continuum, which is shown by K.D.'s continued difficulty in some areas.

Ms. Smith, K.D.'s regular classroom teacher, testified to the Hearing Officer that by the end of her second-grade year, K.D. had made "amazing" progress in using decoding and blending skills for reading, spelling, writing, constructing responses, and using phonics. (N.T. at 118:19–119:9). During her third-grade year, K.D.'s special education teacher worked one-on-one with K.D. K.D.'s reading level increased a full grade level, her IEP goals increased, and she met previous goals set by her IEP. (N.T. at

---

[8] K.D.'s parents' fear is perfectly understandable. Yet I must consider this offer as it reflects the steps the School District took, and services offered in the IEPs, in an effort to help K.D. make progress.

137:22–138:1, 147:21–148:2, 149:15–25, 161:19–162:2, 163:9–15, 164:5–13, 175:16–24). In 2014, K.D.'s phonological processing was tested via the Comprehensive Test of Phonological Processing ("CTOPP"). According to Dr. Cuniffe, the School District psychologist, K.D.'s results on the CTOPP showed clear growth and progress. (N.T. at 280:11–21, 286:25–287:6).

Plaintiffs point to some goals that did not increase in K.D.'s IEP year-to-year. While this is true, it does not establish that the IEPs were not reasonably calculated to confer to K.D. a meaningful educational benefit. In K.C. v. Nazareth Area School District, the district court rejected a similar argument. 806 F. Supp. 2d 806, 819 n.2. (E.D. Pa. 2011). It reasoned that "[a]lthough the goals are the same between 2007 and 2008," this did not mean that the child did not progress from 2007 to 2008. K.C., 806 F. Supp. 2d at 819 n.2. The statutory text of the IDEA also does not support plaintiffs' same-goals argument. It is true the IDEA requires schools to periodically review a child's IEP "to determine whether the annual goals for the child are being achieved." 20 U.S.C. § 1414(d)(4)(A). But the IDEA does not say that, if goals are not being achieved, the school must *increase* the goals. Indeed, that would not make sense or be fair—if a child were not reaching a goal as quickly as expected—to increase the goal. The IEP must be revised to address a lack of progress, but revision of an IEP does not necessarily require increase of annual goals. Id. § 1414(d)(4)(A)(ii).[9]

---

[9] The plaintiffs argue that the Court in Endrew F. "soundly rejected the reasoning that IEPs containing the same annual goals but slightly modified objectives were reasonably calculated to result in educational benefit." (Doc. No. 18 at 3). However, the Court's discussion in Endrew F. did not address such a fine-tuned issue related

K.D.'s results on a Fundations placement test also reflect progress. She took the placement test in the beginning of her second-grade year and then again at the end of her second-grade year. In the category of naming letters, K.D. improved from a 75% to a 95%. In the category of sound-to-letter correspondence, K.D. improved from 80% to a Level 1 at 100%. In the category of writing letters and words, K.D. improved from a 70% to a Level 1 at 80%. In the category of reading words, K.D. improved from "no level" to a Level 1 at 48%. While this progress does not reflect grade-level increases, relative to K.D.'s circumstances, this evinces conferral of a meaningful educational benefit. See Endrew F., 137 S. Ct. at 1000–01 (explaining that "appropriate" progress depends upon "the unique circumstances of the child for whom it was created" and that "grade-level advancement" is not always a reasonable expectation of children with disabilities).

With these principles in mind, namely, that "appropriate progress" depends upon the "unique circumstances of the child" and "grade-level advancement" is not always a reasonable expectation of a child with a learning disability, id., Dr. Kelly's emphasis on

---

specifically to IEP goals. It simply clarified that the standard applied in IDEA cases cannot be the lower "*de minimis*" or "some" benefit standard.

In support of their argument, plaintiffs claim Endrew F. states: "The IEP must *enable* the child to make progress." (Doc. No. 18 at 3) (emphasis added). The actual passage is notably different: "The IEP must *aim* to enable the child to make progress." Endrew F., 137 S. Ct. at 999 (emphasis added). This difference in wording is not merely semantic. In a way, it illustrates the core issue in this case. At times, the plaintiffs seem to argue that if a disabled child is not making progress at the same rate as his or her non-disabled peers, this means that a FAPE was denied. However, the actual analysis of whether a FAPE has been denied asks a more nuanced question: Was the IEP reasonably calculated to enable a child to make progress *in light of the child's circumstances*? While a disabled child's progress is certainly relevant, it is not the end-all-be-all and certainly not a simple inquiry. See id. at 999 (emphasizing that "what 'appropriate progress' looks like" will differ for each child depending on each child's "unique circumstances").

K.D.'s AIMSweb Benchmark testing is not very persuasive. AIMsweb testing is a standardized test that compares K.D. to the rest of her peers (the overwhelming majority of whom do not suffer from a learning disability or dyslexia). As explained by Ms. Smith at the hearing, the AIMsweb benchmark testing is given to an entire grade and revealed that K.D. was "not on grade level for reading fluency." (N.T. at 84:15–21). The AIMsweb is therefore not really a test of how K.D. is responding to her IEP but rather a test of how she measures up compared to her peers. But in K.D.'s case, grade-level advancement in reading may not have been "appropriate" or reasonable to expect. Endrew F., 137 S. Ct. at 1000–01. That is why the School District's IEPs targeted more fundamental reading skills for K.D., offered K.D. tutoring, changed K.D.'s reading program, and offered SDIs and extended school year services to K.D.

K.D. took the WISC-IV again as a third-grader and her IQ score improved into the "average" range. (Id. at 11 ¶ 68). K.D.'s perceptual reasoning and processing speed also improved. (Id.). Her verbal comprehension and working memory remained in the "average" range. (Id.). Per the new WIAT-III test, K.D. improved in some areas and did worse in others. (Id. at 11–12). This is after K.D.'s IEP was amended to add several different SDIs targeting reading and math, as well as Occupational Therapy services and extended school year services.

All the above shows that the School District provided IEPs that were reasonably calculated to provide K.D. with a meaningful education benefit in light of K.D.'s individual circumstances.

## 2.     K.D.'s Subset Score on a Standardized Test

As noted above, K.D. took numerous different kinds of standardized tests. Throughout her time at the School District, she took the WISC-IV, WIAT-III, a Fundations placement test, and the CTOPP.

One of the above tests—the WIAT-III—was taken twice by K.D. The WIAT-III consists of sixteen (16) different subtests. These yield eight (8) different composite scores: (1) oral language, (2) total reading, (3) basic reading, (4) reading comprehension and fluency, (5) written expression, (6) math, (7) math fluency, and (8) total achievement. (Doc. No. 13-2, K.D.'s Evaluation Report at 10). The second time K.D. took this test, her score in one of the above eight categories (total reading) decreased. K.D.'s parents take this to mean that K.D. regressed completely and made no meaningful progress at the School District.

As recognized by the Hearing Officer, the plaintiffs' argument is a mischaracterization. Although K.D. scored lower the second time around on 1 of 8 composites, she also scored significantly higher in other areas. In early reading skills, K.D.'s score jumped 24 points. In pseudoword decoding, K.D.'s score jumped 9 points. K.D.'s score in basic reading modestly improved as well. K.D.'s teachers also noted her progress. That K.D. scored lower on 1 of 8 subsets on one standardized test (out of a handful of standardized tests she took) does not automatically lead to a conclusion that she was denied a FAPE. This is especially so in light of her "individual circumstances." Endrew F., 137 S. Ct. at 994 (citing 20 U.S.C. § 1414).

The Third Circuit has recognized that a court's job is to decide whether an IEP was reasonably calculated to confer a meaningful educational benefit. Especially in the context of disabled children, this analysis should be careful not to overly focus on "progress versus regression" in deciding whether this benefit was conferred: "The educational progress of a handicapped child (whether in life skills or in a more sophisticated program) can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit." Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 184 (3d Cir. 1988). Of course, this does not mean that a child's progress is not relevant. It is. Nor does it mean that schools should not strive to enable a child to progress just because that child has a disability. They certainly should and, by law, must. Yet, viewed as a whole, the evidence in this case shows that the School District's IEPs and services were reasonably calculated to confer a meaningful benefit to K.D. based upon her individual circumstances. The progress K.D. made was meaningful in light of her abilities.

The focus on a child's "progress" has led to confusion in our precedent. As clarified recently by the Supreme Court, and earlier by the Third Circuit, this confusion boils down to a distinction between two types of students: (1) a child who is progressing smoothly, grade-to-grade, through school; and (2) a child with a learning disability or cognitive limitation who is not progressing grade-to-grade through school. With the former student, it makes sense to view academic progress, grades, and test scores as evidence that an IEP is reasonably calculated to confer a meaningful educational benefit. But that is specifically because, with a child not afflicted with a learning disability, that is

what should be expected. With the latter student, however, our precedent has warned against engaging in a retrospective analysis of academic achievement in determining the appropriateness of an IEP. This is specifically because, unfortunately, it cannot always be reasonably expected that progress will occur in such a lock-step manner when a child is suffering from a learning disability. See Endrew F., 137 S. Ct. at 1000 (explaining that "the goals may differ" for a child with a disability); D.S., 602 F.3d at 567–68 (clarifying that academic achievement and grades are less relevant in the context of intellectually disabled children when assessing the reasonableness of an IEP).

The IDEA "requires that school districts prepare the IEPs based on the student's needs; so long as the IEP responds to the needs, its ultimate success or failure cannot retroactively render it inappropriate." Carlisle, 62 F.3d at 534. This, as already stated, does not mean that a school can aim for no progress simply because a child is disabled. The IEP must be reasonably calculated to confer a meaningful educational benefit to the child based on that child's individual and unique characteristics. I find no error in the Hearing Officer's determination that the School District's IEPs were reasonably calculated to confer to K.D. a meaningful educational benefit in light of K.D.'s individual circumstances.

In K.D.'s case, her progress in reading was slow compared to her peers. Sometimes she would take a few steps forward, and then one step back. In light of K.D.'s severe learning disability in the areas of comprehension, reading, and writing, this kind of fragmented progress could reasonably be expected. I am certainly mindful of the frustration this must produce for K.D.'s parents, but I cannot say that the School District

did not provide K.D. with IEPs reasonably calculated to confer to her a meaningful educational benefit in light of her circumstances. Her progress in the fundamental areas of reading and writing was certainly meaningful in aiding her to continue to progress in some of the areas she continues to struggle in.

### 3. K.D.'s Expert Witness

K.D.'s parents attack the Hearing Officer's treatment of their expert witness. The Hearing Officer found the expert's credibility, and bases for her opinions, questionable.

I must accept the Hearing Officer's credibility determinations "unless the non-testimonial extrinsic evidence in the record would *justify* a contrary conclusion." Shore Reg'l, 381 F.3d at 199 (emphasis in original). The plaintiffs have not pointed to non-testimonial extrinsic evidence sufficient for me to depart from the Hearing Officer's credibility determination of the plaintiffs' expert.

K.D.'s expert witness, Dr. Kelly, opined that the School District made no changes to K.D.'s IEP during her entire time at the School District. As previously discussed, this is not true. The IEPs contained various changes, not only year-to-year, but sometimes month-to-month. These changes included changes to baseline scores, goals, additional and intensive SDIs, changes to the reading program (from Harcourt to Wilson's Fundations), addition of extended school year services, and the addition of Occupational Therapy services for K.D.

Dr. Kelly never spoke to Ms. Smith—K.D.'s special education teacher in first and second grade. (N.T. at 113:23–114:3). She also never spoke with Ms. Gleason—K.D.'s special education teacher in third grade. (N.T. at 143:25–144:2, 174:11–13, 343:1–2). Dr.

Kelly was not necessarily required to speak with these school officials. However, in an area of the law that defers to "the exercise of judgment by school authorities," Endrew F., 137 S. Ct. at 1001–02, it would have helped Dr. Kelly's credibility to do so since she claims that K.D.'s reading instructions did not change "for years." (N.T. at 311:13–17).[10] In reality, K.D.'s reading instruction changed in many ways. For one, the School District switched from Harcourt/Project Read to Wilson's Fundations program. In addition, the School District added multiple SDIs to change the way K.D. was instructed in reading. Had Dr. Kelly consulted with or questioned K.D.'s special education teachers, she would have learned this information. What's more, "[w]here a hearing officer 'has heard live testimony and determined that one witness is more credible than another witness, [the hearing officer's] determination is due special weight.'" D.S., 602 F.3d at 564.

Plaintiffs' insistence that K.D. made absolutely no progress whatsoever, under either a norm-based or criterion-based metric, is rebutted by Dr. Kelly's own report. According to Dr. Kelly's report, K.D. scored in the middle of the pack (48th percentile) in "sound blending" on the Woodcock-Johnson III Tests of Cognitive Ability. (Kelly Report at 24). She was in the 86th percentile in "concept formation," the 68th percentile in "verbal comprehension," and 59th percentile in "spatial relations." (Id.). On the Woodcock-Johnson III Tests of Achievement, as a third-grader K.D. scored in the 6th grade level in "picture vocabulary" and at the 5th grade level in "oral comprehension." (Id.). Of course,

---

[10] I do not join in the School District's criticism of the fact that Dr. Kelly did not recommend changes to the School District regarding K.D.'s IEP. That is not Dr. Kelly's job. Nevertheless, I do not find reason to disturb the Hearing Officer's findings that Dr. Kelly willfully resisted communicating with the School District in formulating her opinions that the School District's instructions and services were insufficient.

K.D. did worse in other areas. But the bigger picture, and the evidence of the entire record, does not confirm the plaintiffs' argument that K.D. made *de minimis* progress.

In sum, I find that the Hearing Officer thoroughly considered the evidence in determining that K.D. was not denied a FAPE. I also find that, although her progress was not that of a student without a learning disability, in light of her circumstances, K.D.'s IEPs were reasonably calculated to provide her a meaningful educational benefit. Accordingly, the Hearing Officer did not err in finding that K.D.'s parents were not entitled to tuition reimbursement for K.D.'s subsequent private school placement.

### D. *Rehabilitation Act and ADA Claims*

K.D.'s parents argue that the School District's above conduct violated Section 504 of the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA).

Under the RA, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program" receiving federal funding. 29 U.S.C. § 794(a). "The ADA contains nearly identical language, and the Third Circuit has held that the same standards govern claims arising under both statutes." School Dist. of Phila. v. Post, Civ. A. No. 15–4501, 2017 WL 2879684, at *13 (E.D. Pa. July 5, 2017) (citing Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282–83 (3d Cir. 2012)).

To make out a claim under either the ADA or RA, the plaintiff must show: (1) a disability; (2) plaintiff was otherwise qualified to participate in a school program; and (3) plaintiff was denied the benefits of the program or was otherwise subject to discrimination because of his or her disability. Chambers v. School Dist. of Phila., 587

F.3d 176, 189 (3d Cir. 2009). There is no dispute that K.D. has a disability and is qualified to participate in a school program.

However, plaintiffs have presented no evidence that K.D. "was excluded from participation in, denied the benefits of, or subject to discrimination" in the School District. W.H. v. Schuykill Valley Sch. Dist., 954 F. Supp. 2d 315, 331 (E.D. Pa. 2013). There is no evidence the School District relegated K.D. to lesser services, activities, programs, or other opportunities. Furthermore, the IDEA, Section 504 of the RA, and the ADA are nearly identical. I have already determined there was no IDEA violation, so no further remedy or relief is warranted under the RA or ADA.

## IV.    CONCLUSION

For the reasons stated above, I will grant the School District's Motion for Judgment on the Administrative Record and deny the Plaintiffs' Motion for Judgment on the Administrative Record. The decision of the hearing officer will be affirmed.